No. 28,675.

R. R. SAWTELLE, *Appellee*, v. THE COSDEN OIL AND GAS COMPANY and THE MID-CONTINENT PETROLEUM CORPORATION, *Appellants*.

(277 Pac. 45.)

Opinion filed May 4, 1929.

*Ed T. Hackney,* of Wellington, *J. C. Denton, J. H. Crocker, I. L. Locke-witz, H. M. Gray* and *R. H. Wills,* all of Tulsa, Okla., for the appellants.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *O. Renn,* all of Arkansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action upon an oral contract whereby defendants agreed to assume and pay plaintiff's labor bill against a contractor who at the instance of defendants had undertaken to drill an oil-and-gas prospect hole on a Sumner county quarter section to a depth of 3,800 feet, but who threw up the job when he had reached a depth of 2,929 feet and went off without paying his laborers, one of whom was this plaintiff.

Plaintiff's petition alleged the interest of the defendants in the premises, their contract with one G. G. Sawtelle, the contractor, the drilling of the well, plaintiff's services as a laborer on the project to the value of $1,288, the suspension of operations by the contractor on December 7, 1925, and plaintiff's right to a lien on the leasehold and well-drilling equipment, piping and miscellaneous chattels used on the project for the satisfaction of his wage claim; and that he

and a number of other laborers in like situation had assigned their claims to a trustee, who brought suit in the district court of Sumner county thereon and obtained an attachment on all property actually or colorably subject to the payment of their wage claims, and that plaintiff and other laborers in like situation were about to file statutory lien claims against the leasehold, well-drilling equipment and miscellaneous chattels pertaining thereto when these defendants made certain arrangements with one Braymer, an expert well driller, to continue the drilling to a depth of 3,600 feet. To enable Braymer to prosecute this job without hindrance and without being deprived of the use of the property subjected by the laborers' attachment proceedings, and to avert the threatened subjection of the property to statutory liens on behalf of plaintiff and other laborers, the defendants orally agreed, as plaintiff alleged, to pay his claim and those in like situation with himself. Plaintiff further alleged that relying on this agreement he and his fellow laborers and their trustee forebore to file statutory lien claims and permitted Braymer to use the tools, fixtures, pipe lines, casing, derrick and other chattels covered by their attachment, and that pursuant to such agreement Braymer and defendants had the benefit of all the attached property without interference in prosecuting their drilling project to a depth of over 3,800 feet. Plaintiff's petition concluded with an allegation of breach of contract and a prayer for judgment.

The defendant corporations, whose affairs *inter sese* are of no present concern, filed separate answers containing general and specific denials, setting up their interest in the premises by virtue of a lease from the owners of the fee. They admitted and alleged that plaintiff had no lien on the leasehold estate or the drilling equipment and related chattels; they recited the history and disposition of the attachment suit referred to in plaintiff's petition, and concluded with a prayer for judgment of nonliability.

The cause was tried before a jury which rendered a verdict as prayed for in plaintiff's behalf, and judgment was entered thereon. Defendants' motion for a new trial was overruled and they appeal, assigning and arguing certain errors to be considered.

The first point pressed on our attention is that there was no consideration for the oral contract, and that the contract itself, being oral, was void under the statute of frauds.

That feature of the statute of frauds which denies the binding

force of a promise to answer for the debt of another unless evidenced in writing and signed by the promisor does not materially affect this case. Either the defendants, for a sufficient consideration passing to themselves, obligated themselves to pay the plaintiff's claim or they are not bound. Plaintiff did not seek to hold them merely because they had orally promised to pay the debt of Gib Sawtelle, the contractor. The defendants had spent a lot of money on the incompleted work of the contractor, and they stood to lose it all unless the prospect hole was drilled to a sufficient depth to determine whether oil and gas lay there. Even if it should prove to be a dry hole, other leaseholders of the vicinity had obligated themselves to contribute to the expense, but to obtain those contributions a specified depth had to be drilled. These contributions were to be available only as "bottom-of-the-hole" money. Moreover, the leasehold property and drilling equipment, piping, and the miscellaneous chattels pertaining to such a project, were tied up more or less effectively by the laborers' attachment proceedings, and threats of labor liens were impending. An adjustment and understanding concerning these matters which neutralized for the time being the effect of the attachment and held off the imposition of statutory labor liens was quite a substantial consideration, both as a hindrance to the laborers and as a benefit to the defendants, and the obligation thereby assumed was an independent one made by defendants in their own behalf, not merely a promise to answer for the debt of another. (*Patton v. Mills*, 21 Kan. 163; *Johnson v. Huffaker*, 99 Kan. 466, 162 Pac. 1150; *Gestenslager v. Rixon*, 107 Kan. 623, 193 Pac. 184; *Smith v. Investment Co.*, 112 Kan. 201, 210 Pac. 477; *Higgin Mfg. Co. v. Bankers Mortgage Co.*, post, p. 267.)

Part of defendants' argument on this point is based on the assumption that the time had gone by in which the laborers could have subjected the property to their statutory liens. The contention is untenable. The contractor threw up the job on or about December 7, 1925. The alleged agreement relied on to support this action was made, if at all, on March 8, 1926, three months later. There was still about a month's time in which to subject the property to statutory liens. (R. S. 55-207, as amended by Laws 1925, ch. 197.)

It is next asserted that the evidence was insufficient to prove that the contract relied on was made. That evidence, in brief, was to this effect: An attorney for the laborers, S. C. Burnette, addressed a letter to the defendants concerning the labor claims of his clients. De-

fendants referred this letter to their attorney, R. H. Wills. Pursuant thereto Wills conferred with plaintiff's attorney on one or two occasions, and on March 8, 1926, he came to Arkansas City, where, according to the testimony of three witnesses for plaintiff, Burnette, Renn and Broadhurst, the agreement sued on was effected. Renn testified in part:

"Mr. Burnette called me in and wanted me to approve an agreement which he and Mr. Wills had entered into. He told me that Mr. Wills had offered for their company that if we would release the attachment suit and let Mr. Braymer go ahead and finish this well to the contract depth that they would pay our claims in full, and I raised the objection. . . .

". . . Mr. Wills entered the conversation there. He said he didn't see any reason why it wouldn't be satisfactory. He said if we would allow them to go ahead and finish the well, after it was finished they would pay, would pay all the labor, but that it was not good policy to pay any of the labor claims until after it was completed. As I remember I presented the situation there, and finally Mr. Wills I think, said, you and Mr. Burnette talk it over. . . . Mr. Burnette and I talked it over afterwards, and later on had some conversation again with Mr. Wills. . . .

". . . Mr. Wills came in along about noon and had a conversation there.

"Mr. Wills made inquiry as to what we had agreed upon. I told him that our clients, while we had only talked to Mr. Batdorf, they were not willing for them to go ahead, that they felt like they ought to have their money, but that if he assured me that these clients would get their money when the well was completed we would let them go ahead at this time. . . . He assured me if we would let Mr. Braymer finish the well they would pay the claims in full.

. . . . . . . . . . . . . . .

"Q. Did you believe he would do that? A. Yes, sir.

"Q. Would you have consented to them going ahead and using this attached property unless they had made that agreement? . . . A. Absolutely not."

The testimony of Burnette and Broadhurst was in substantial accord with that of Renn. So defendants' contention that the evidence was not sufficient to prove the contract cannot be upheld. It was sufficient to invoke and require the determination of the jury. We do not overlook the testimony of R. H. Wills in defendants' behalf, in which he denied that he had entered into any such agreement as that testified to by plaintiff's witnesses. As to that we will only observe that lawyer-witnesses were used on both sides to a degree not approved by the ethics of our profession, the pertinent canon being:

"When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to

the ends of justice, a lawyer should avoid testifying in court in behalf of his client." (Canons of Professional Ethics, 53 Rep. Am. Bar. Ass'n, 774.)

Nor have we failed to note the letter of Burnette written March 27, 1926, to the defendants and particularly invoking the attention of Mr. Wills. It contained statements and observations at variance with the idea that a fair and square contract such as testified to by plaintiff's witnesses had been made with Wills some twenty days prior thereto. However, the seeming discrepancy between Burnette's letter of March 27 and his testimony concerning the making of the contract on March 8 offered an excellent opportunity for a skillful cross-examiner to discredit Burnette's testimony, but the record does not show that counsel for defendants took much advantage of it. Moreover, Wills' own testimony was not that no agreement of any sort was made, but that there was a sort of nebulous understanding that if Braymer was permitted to go ahead and finish the well notwithstanding the attachment and without interference by plaintiff and his fellow-laborers and if the cost was not too great and if the parties interested in discovering what the finished well would reveal contributed their promised share of bottom-of-the-hole money, his clients would pay the plaintiff and the other laborers. Wills, himself, testified:

"My idea was to try and settle the entire matter. . . . I wanted to try to settle the whole thing absolutely from start to finish. I was trying to effect a settlement of all these controversies just as Burnette was trying to effect a settlement for his clients. . . . I was absolutely trying to settle them." .

The weight and credence of the evidence summarized as above, together with all the circumstances, and even including the discrediting significance which might attach to Burnette's testimony because of his letter of March 27, were all matters for the consideration of the jury, and their verdict with the approval of the trial court thereon ends all controversy over the facts, and the contention based on the insufficiency of the evidence cannot be sustained. (*State, ex rel., v. Telephone Co.,* 115 Kan. 236, 269, 223 Pac. 771; *Agricultural Ins. Co. v. Ætna Ins. Co.,* 119 Kan. 452, 457, 239 Pac. 974; *Fagerstrom v. Keller,* 124 Kan. 386, 389, 260 Pac. 632; *Citizens State Bank v. Wiseman,* 125 Kan. 510, 514, 265 Pac. 39.) In *American Nat'l Bank v. Lipe,* 123 Kan. 674, 679, 256 Pac. 967, it was said:

"Of what avail is it to seek to persuade this court that this controverted issue of fact might very well have been decided the other way by the tribunal authorized to determine it? (*Perkins v. Accident Association,* 96 Kan.

553, 555, 152 Pac. 736; *Lumber Co. v. Workman,* 105 Kan. 505, 508, and syl. ¶ 1, 185 Pac. 288.)"

Another contention on which defendants place much emphasis is that R. H. Wills had no authority to make the contract on which this action is founded. In support of that point they invoke the common rule that an attorney has no general authority to make monetary obligations binding on his clients, and that it was not shown that Wills had either express or implied authority to bind his clients in this case. Implied authority was fairly deducible from the circumstances. A communication from plaintiff's attorney addressed to defendants was referred to Wills for attention. He acted upon that reference. He made the contract. His clients got the benefit of that contract. Burnette's clients, plaintiff and the other laborers were induced to depend on Wills' promise made on his clients' behalf, and relying thereon they forbore to enforce their attachment proceedings and forbore to file statutory liens because of Wills' promise. The fact that defendants had referred Burnette's letter pertaining to their interests to Wills' attention quite naturally led them to put faith in what he said. Since defendants did turn the matter over for Wills to attend to, the mere fact that he happened to be an attorney did not disqualify him to act in the broader capacity of a negotiator in which he did serve the defendants. And while speaking of rules pertaining to the authority of attorneys to bind their clients, we must not forget the primary rule that an attorney is presumed to deal candidly with his clients and to inform them of what he has done and is doing in their behalf, and the presumption may be indulged in this case that Wills did apprise his clients of the highly beneficial contract he had effected in their behalf on March 8, 1926, on which this action is founded. (*Hess v. Conway,* 92 Kan. 787, 794, 142 Pac. 253.) It would be a queer rule of law to hold that a corporation could turn over to an agent a matter of business for attention, and when that agent had negotiated a settlement of the business beneficial to it that it could assume the position that it had no notice of the terms upon which the settlement had been effected and its benefits obtained, and thus be relieved of the pertinent obligation which its agent had made in its behalf, especially when the opposite party had been induced to forego his tactical advantage on the faith of such settlement. (22 C. J. 377, 385; 1 R. C. L. 483, 484.) In *Globe & Rutgers F. Ins. Co. v. Warner Sugar R. Co.,* 176 N. Y. S. 3, it was said:

"The rule that one must ascertain an agent's authority or deal with him at his peril, and that a special agent cannot bind his principal when acting outside the scope of his authority, is subject to the qualification that, where an agent is intrusted with a certain kind of business, he becomes between the principal and parties dealing with him, the general agent for such business, and his acts bind the principal, though he violates a private instruction." (Syl. ¶ 2.)

In the opinion it was said:

"The reason for this rule is obvious. No man is at liberty to send a man forth to deal for him, with secret instructions as to the manner in which he is to execute his agency, which are not communicated to those with whom he deals, and then when his agent has deviated from those instructions to say that he was a special agent, that the instructions were a limitation upon his authority, and those that dealt with him acted at their peril. If the principal deemed the transaction to his advantage the instructions would remain a secret, and he would obtain the benefit. If in his opinion it was otherwise he could escape liability." (p. 5.)

It is also suggested that if the agreement of March 8, 1926, was ever made it was waived and abandoned. This suggestion is prompted by certain language of Burnette in his letter of March 27 to Wills in which he especially urges payment of the claims of two laborers whose status was somewhat different from that of the others. Burnette wrote:

"While the other matter is in abeyance we thought the peculiar circumstance of their connection with this well would justify you in entertaining the proposition to settle with these two boys."

Defendants argue that this language shows that the agreement of March 8 was "in abeyance." But a matter in abeyance is not necessarily one that has been abandoned. Burnette's obvious meaning was that, while the matter of paying the other laborers was being deferred until the completion of the well, there were good reasons why the claims of two of them should be paid without delay—that their wages should not be held in abeyance to await the completion of the well. Further than that, we see nothing in the point except a jury argument.

The next point argued by defendants pertains to the exclusion of certain evidence. This relates to exhibits of pleadings in other lawsuits which some of the attorneys for this plaintiff had filed against the trustee of the bankrupt contractor on behalf of other creditors of the bankrupt, and which contained no intimation of the agreement of March 8, 1926, sued on in this action. The argument is made that these pleadings would tend to prove that the alleged agreement

of March 8 was never made, or was abandoned. This point is very remote, quite fanciful. It is, indeed, rather apparent that one or more attorneys bungled the cause of the laborers to a certain extent, and that better qualified counsel had to be brought into the case to put it to rights and to invoke whatever procedural rights plaintiff might have to enforce his just claim against the formidable defenses set up against it. The exclusion of those pleadings was not erroneous. Other complaints on the exclusion of testimony cannot be considered because—whatever it was—it was not brought into the record as the code provides. (Civ. Code, § 307; R. S. 60-3004 and annotations; *Newton v. Newton,* 127 Kan. 624, 274 Pac. 247.)

Yet another error is assigned on misconduct of the trial judge in "making various and sundry prejudicial remarks upon the trial of the case in the presence of the jury." There is no merit to this point and no excuse for raising it here. If anything of that sort had transpired it was the duty of counsel to raise it in the trial court at the proper time. Failing in that, it will not be considered on appeal. (*State v. McKimson,* 119 Kan. 658, 240 Pac. 567; *American Automobile Ins. Co. v. Clark,* 122 Kan. 445, 252 Pac. 215; *State v. Robinson,* 124 Kan. 245, 251, 259 Pac. 691.)

The foregoing disposes of the principal errors urged in defendants' brief. Other arguments advanced therein have not been overlooked, but the reasonable limits of space have already been exhausted in this appeal. In defendants' first brief and in their reply brief they argue that plaintiff and his fellow laborers had but a very attenuated claim on the property covered by the attachment, and that their right to a statutory lien would have been of little or no value, seeing that defendants had a claim on all the attached property superior to the attachment and superior to any statutory liens which might have been filed by virtue of the terms of their contract with the contractor. That contention is very far from being self-evident; we greatly doubt its soundness; but what is more important is that defendants did not have sufficient faith in it to litigate that question to a conclusion, but chose instead to make the bargain they did with plaintiff. It does not take a legal cinch to form a sufficient consideration for a settlement; a fairly debatable point is quite enough. (*Reed v. Kansas Postal Telegraph & Cable Co.,* 125 Kan. 603, 264 Pac. 1065.)

The record contains no error, and the judgment is affirmed.