No. 28,715.

CYRUS OSBORN et al., *Appellants*, v. J. J. COVERDALE et al., *Appellees*.

(281 Pac. 897.)

Opinion filed November 9, 1929.

*Jay T. Botts,* of Coldwater, for the appellants.

*F. C. Price* and *F. N. Cossman,* both of Ashland, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to set aside a deed and bill of sale executed by an aged widow in favor of her two stepsons. It was begun by the grantor's brother, Cyrus Osborn, as her next friend. The petition alleged that the grantor was incompetent and that the execution of the instruments was effected by undue influence. While the cause was pending on appeal the grantor died, and the action was revived and prosecuted by her next of kin.

In 1895 one J. A. Coverdale owned a farm in Clark county. He was then a widower 39 years old. He had three young sons, James aged eleven, Roy aged six, and Charles, who afterwards died. Coverdale married Carrie Osborn, a spinster 47 years of age. They resided on the farm for many years, the family consisting of Coverdale and his wife and his three young sons. An elder sister of the wife, Priscilla Osborn, to whom Mrs. Coverdale was greatly attached, made her home with the Coverdales for most of the thirty-odd years of their wedded life. An elderly kinsman of Coverdale, "Uncle Bob," also had a place at the family fireside for an indefinite period.

Charles, the eldest son, died when he was twenty-two. James remained at home until he attained his majority and Roy until he was seventeen. James followed the life of a day laborer. Roy became a farmer.

Some years ago Coverdale incurred a liability as surety for Cyrus Osborn, his wife's brother, which cost him a considerable sum; and in reimbursement therefor Cyrus conveyed to Coverdale a house in Protection. Coverdale then rented his farm to his son Roy, and in the autumn of 1926 he and Carrie and Priscilla and Uncle Bob took up their abode in the house in Protection. About Thanksgiving, 1926, Carrie sustained a paralytic stroke, from which she partially recovered. In August, 1927, when she was 80 years old, she suffered another stroke which paralyzed the right side of her body, greatly affected her speech, and confined her to her bed, requiring the care of a nurse until her death in June, 1928. Late in 1927 Coverdale himself was taken ill. On November 27 he sent for his banker and a notary and executed a power of attorney authorizing his son James to attend to his business affairs. The banker came in response to the summons on the assumption that Coverdale wanted to make a will, but Coverdale told him he did not intend to do so, but did want his wife Carrie taken care of as long as she lived, and that his two sons were to have all his property. On November 29 Coverdale died intestate. Three days later Mrs. Coverdale executed a deed conveying to James and Roy her undivided one-half interest in the farm, and also executed to them a bill of sale of her interest in the personalty of Coverdale's estate. The deed contained a reservation of a life estate in her own behalf and this explanatory proviso:

"It is the intention of the grantor to reserve unto herself during the full term of her natural life the right of possession and occupancy in and to the said real estate and the rents and profits arising therefrom, and to convey unto the said grantee herein the full fee title and the said real estate subject only to the life estate herein reserved by first party."

On the issues joined between the litigants the cause was tried by the court without a jury. More than a score of witnesses testified, and the pertinent facts were developed at much length.

The trial court specifically found the original plaintiff, Carrie Coverdale, had sufficient mental capacity to execute the deed and bill of sale, and that the stepsons, James and Roy, had sustained the burden imposed by any fiduciary relationship existing between them

and their stepmother. The issues generally were resolved in favor of defendants.

Plaintiffs appeal. They no longer contend that Carrie lacked mental capacity to execute the instruments, but they insist that the trial court committed error in not finding that the deed and bill of sale were obtained by the exercise of undue influence by defendants. We have repeatedly perused the abstract of 110 pages and the counter abstract of 28 pages and have carefully noted the argument to that effect advanced in plaintiffs' brief. While the testimony was lengthy and many witnesses testified, some being called by both sides, the evidence did not develop any sharp controversy over the controlling facts. It does not readily appear that a fiduciary relationship existed between Carrie Coverdale and her stepsons. Apparently the relationship between them was merely the familiar one of good accord which prevails between any aged mother and her dutiful sons when the latter have grown to manhood and have families and households of their own. (*Linn v. Blanton,* 111 Kan. 743, 208 Pac. 616.) However that may be, the defendants took the witness stand and narrated all the facts touching their relationship with their stepmother at and about the time the deed and bill of sale were executed, and according to their testimony, as well as that of several other witnesses, the defendants were absolved from any justifiable suspicion of undue influence. (*Shell v. Mulligan,* 103 Kan. 185, 173 Pac. 286; *Smith v. McHenry,* 111 Kan. 659, 207 Pac. 1108.) Furthermore, the circumstances were persuasive evidence to the contrary. Some such course as that taken by Carrie was necessary unless her own and her husband's long-established purpose for the disposition of the property was to be defeated. Although she apparently had all the interest of a natural mother in James and Roy, whom she had reared to manhood, the undivided one-half interest in the Coverdale farm and personalty which descended to her on the unexpected death of her husband would pass entirely out of the Coverdale family unless she took some positive action in behalf of her stepsons. It is quite clear from the record how the matter came to depend upon some action of Carrie's. She and her husband intended that the property should go to the boys when they were through with it. The relations between the parents and sons being what they were, it would have been rather strange if they had purposed otherwise. Touching that relationship, a next-door neighbor testified:

"Her attitude toward the boys was that of a mother to a son. She was always glad to see them and always extended her hand as much as she could to shake hands with them, always agreeable, always called them by name. They always addressed her as mother. . . . She seemed to think lots of Roy and was always glad to see him, always put out her hand and pull him down and kiss him when he would come. When Roy's baby died . . . she broke down and cried and pulled him down and kissed him."

When Carrie was eighty years old and had suffered two paralytic strokes and was bedfast and nearly speechless, while her husband was eight years her junior and seemingly destined to outlive her, it was quite reasonable that he should tell his banker he did not want to make a will, that while he wanted Carrie cared for as long as she lived he intended his boys should have everything. If he had outlived Carrie it would have required neither will nor deed to dispose of his property according to his and her wishes. But when it transpired that he was the first to die, it was very natural that his feeble old spouse should do what was obviously necessary to carry her dead husband's wishes and her own into effect. (*Warwick v. Zimmerman*, 126 Kan. 619, 626, 270 Pac. 612.)

On plaintiffs' behalf it is argued that Carrie did not have independent advice. It does not appear that she had independent advice as to how she could most readily and effectively carry out her own and her deceased husband's purpose that James and Roy should have the property; but the evidence is abundant and all to one effect that she and her husband had long intended that James and Roy should have the property, and as late as five days before she signed the instruments she heard her husband say how he wanted the property disposed of—to Carrie's care and maintenance as long as she lived and to James and Roy thereafter. When the fact was brought to her attention that this lawsuit had been begun to set aside the deed and bill of sale she resented it, and notwithstanding her mumbling and imperfect speech she made it plain that what she had done was the "way Pa wanted it." The rule as to the necessity of independent advice is that the maker of a questioned instrument should understand its legal effect, not that she need understand its particular form. Carrie had the very best of independent advice from her own husband not more than five days before she executed the challenged instruments in this action, and a careful reading of this record leaves no tangible ground for believing that she did not understand the legal effect of the deed and bill of sale.

But the one predominating feature of this lawsuit is that it never

presented anything for judicial determination except questions of fact; and it cannot be gainsaid that there was substantial evidence— testimony of witnesses and potent evidence inherent in the circumstances surrounding the general attitude of the father, mother and sons, toward each other—to warrant the trial court's findings; and under a multitude of familiar precedents (*Sawtelle v. Cosden Oil & Gas Co.*, 128 Kan. 220, 225, 277 Pac. 45) a judgment based thereon may not be disturbed on appeal.

The judgment is affirmed.

HARVEY, J., not sitting.