No. 29,729.

Sarah E. Fox, *Appellant,* v. J. W. Eaglin et al., *Appellees* (Naida L. Simpson and Esther Simpson, *Cross Appellants*).

(295 Pac. 662.)

 Opinion
filed February 7, 1931. 

*Nellie Cline,* of Larned, and *Paul R. Nagle,* of St. John, for the appellant.

*W. H. Vernon, J. S. Vernon, George W. Finney* and *Roscoe E. Peterson,* all of Larned, for appellee J. W. Eaglin.

*William Davison,* of St. John, for appellees and cross appellants Naida L. Simpson and Esther Simpson.

The opinion of the court was delivered by

DAWSON, J.: This was an action to set aside the probate of a will and to cancel and set aside a deed.

The plaintiff, Sarah E. Fox, was the mother of the deceased testatrix, who for the last twenty years of her life bore the name of Mabel E. Fox Eaglin and supposed herself to be the lawful wife of the defendant, J. W. Eaglin, who is the principal beneficiary of the will in controversy. Eaglin, however, for all those years had a wife incarcerated in the state hospital for the insane at Osawatomie since 1905. Whether he knew that fact during most of the time he lived with the testatrix is not determined by this record.

In 1923 plaintiff sold and conveyed to the deceased and to defendant a house and some lots in Larned for $2,800. The grantees were designated in the deed as "James W. Eaglin and Mabel E. Eaglin, his wife, or the survivor." It is this deed which plaintiff seeks to set aside.

About 1909 Eaglin came to Larned and commenced the practice of law. He was then about twenty-eight years old. He became acquainted with the plaintiff's daughter, Mabel E. Fox, a school teacher about thirty-three years of age. They were married in August of that year and lived together as husband and wife until the death of Mabel on February 3, 1929. Until failing health overtook her the last year or two of her life, Mabel followed her profession as a school teacher, and Eaglin had a rather limited law practice until 1924, when he was appointed probate judge of Pawnee county, a position he has held since that time.

During the primary election campaign in 1928 a rumor developed in Pawnee county that Eaglin had a wife somewhere in a lunatic asylum. When Eaglin heard it he telegraphed an inquiry to the officials of the state hospital at Osawatomie and promptly received an answer that "Vernie May Antle Eaglin," who had been admitted

to that institution on September 13, 1905, was still living and confined therein. At that time and for some time theretofore, Mabel, ostensible wife of Eaglin, was in a precarious state of health; but as tactfully as possible, if the evidence in his behalf is to be believed, he broke the news to her. She had known for ten years, perhaps more, that Eaglin had been married before he met her, and that he had a son by a former wife. Mabel was a woman of superior culture and had strict notions of morality, and all parties to this record agree that she would never have formed an unconventional relationship with defendant nor have gone through a marriage ceremony with him if she had known that his former wife was still alive and undivorced.

Within a few days after learning of the state of affairs between herself and the man she had regarded as her lawful husband, Mabel sent for a lawyer and told him she desired to make a will in favor of defendant. This lawyer discussed the situation with her, and she informed him she had become aware of the embarrassing facts which placed herself and Eaglin in an equivocal position before the community, but she avowed her intention to devise her property in his favor nevertheless. She also directed the attorney to secure for her the services of another attorney whom she named to assist him, and within a day or two the will was drawn and explained to her by one of these lawyers. She expressed her understanding and approval of its terms as drawn, and thereupon, on August 9, 1928, it was executed in due form.

The alleged grounds of attack on the will were fraud and undue influence—that after the fact that Eaglin's first wife was still alive became known he kept the members of Mabel's family away from her, denied them the privilege of visiting her, and that she had no independent advice. Eaglin did forbid some of her kindred to come into his house, and Mabel's mother, plaintiff herein, was one of those excluded. Apparently plaintiff and defendant had fallen out for some reason and he was displeased at her behavior towards him. On April 30, 1928, he addressed a letter to plaintiff saying:

"This is to advise that I deem it necessary that you, by conduct and words, manifest a proper disposition toward me, before making visits at my house. I regret the necessity of taking this action, but feel that such course is my plain duty under the circumstances."

During the summer and autumn of that year, and including the

time when the will was made, plaintiff was not permitted to visit Mabel without Eaglin or a nurse being in attendance. To counteract the bad impression which those facts would be likely to make, defendant put several physicians on the witness stand, some of whom had been in attendance upon Mabel in her illness; and with practical unanimity they avowed that quiet and seclusion were imperatively necessary in her affliction, which was of a nervous character and a consequence of two strokes of paralysis which she had suffered. Another of the medical men testified that while agreeing with the treatment of seclusion prescribed or approved by the others he would have made an exception in favor of plaintiff, the patient's mother. One witness in defendant's behalf was the mother of the unfortunate inmate who had been immured in the lunatic asylum since 1905. She testified that she did not know that her daughter, wife of Eaglin, was still alive; that she had heard of her death, but she had never made further inquiries. It was in 1913, as she remembered it, when she first heard that her daughter was dead.

The alleged fraud and undue influence relied on to defeat the will were chiefly the facts set out above and the inferences derivable therefrom.

The basis for the cause of action to set aside the deed was chiefly the testimony of plaintiff and the inferences of fact inhering in the circumstances which might tend to show that plaintiff would not have sold the property to defendant if she had known that he was not the lawful husband of her daughter.

The trial court declined to make certain findings of fact requested by plaintiff, but did make comprehensive findings, the most important of which read:

"I.

"James W. Eaglin and Vernie May Antle were married at Elk City, Kan., on January 7, 1903, and were never divorced. On September 13, 1905, in the probate court of Wyandotte county, Kansas, Vernie May Antle Eaglin was adjudged insane and committed to the Osawatomie state hospital at Osawatomie, Kan., and was still living and confined in that institution on October 21, 1929.

"II.

"On August 24, 1909, a marriage license was issued by the probate judge of Pawnee county, Kansas, authorizing the marriage of James William Eaglin and Mabel Estelle Fox, both of Larned, Kan., and a marriage ceremony was performed under the authority of said license on August 24, 1909, at Larned, Kan. Said parties continued to live together as husband and wife until the

death of Mabel E. Fox Eaglin on, the 3d of February, 1929. That at the time of the issuance of said marriage license and the performance of the marriage ceremony on August 24, 1909, Mabel E. Fox had no knowledge that the defendant J. W. Eaglin had previously married.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"VI.

"In 1919 J. H. Eaglin, the father of J. W. Eaglin, told Mabel E. Fox Eaglin that the said J. W. Eaglin had been previously married and had a son by such former marriage. This was the first knowledge that Mabel E. Fox Eaglin had regarding the former marriage of J. W. Eaglin.

"VII.

"Mabel E. Fox Eaglin suffered a stroke of paralysis about the 30th day of May, 1927, and a second stroke about the 19th day of April, 1928, and a third stroke on or about September 2, 1928; following each of the first two strokes she partially recovered her health, and was able to be about the house and to take rides in an automobile. Her mental condition was not noticeably affected except for a short time following each of said strokes. She also suffered from diabetes, and a very strict diet was necessary.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"IX.

"A day or two prior to August 9, 1928, Mabel E. Fox Eaglin discussed with W. H. Vernon and also with G. W. Finney, attorneys at law of Larned, Kan., the matter of making a will, and asked them to collaborate in preparing the will for her. At these conversations she told Mr. Finney and Mr. Vernon that she knew that Mr. Eaglin had another wife living from whom he had never been divorced, but that she nevertheless desired to make a will leaving all her property to him for life, with full power of disposition, and with a remainder over to Naida L. Simpson and to Tascille Eaglin, wife of William Eaglin, Jr., and to Esther Simpson, wife of Harold Simpson. At about this time and prior to August 9, 1928, Mabel E. Fox Eaglin had a conversation with H. S. Rogers, county attorney of Pawnee county, in which she told him that she knew about Mr. Eaglin's former marriage.

"X.

"Mr. Vernon and Mr. Finney prepared a will for Mabel E. Fox Eaglin, in accordance with the instructions she had given them, and delivered this will to Mr. Eaglin, and on August 9, 1928, W. H. Vernon and Emil W. Kaiser, together with Mr. Eaglin, went to the Eaglin home; at that time Mabel E. Fox Eaglin had the will which had been prepared, and Mr. Vernon inquired of her whether she had read it and whether it was drawn as she desired it, and she stated that it was. At that time Mabel E. Fox Eaglin executed said will, and Emil W. Kaiser and W. H. Vernon signed this will as witnesses."

From these and less significant findings the trial court deduced the following conclusions of law:

"Conclusions of Law.

"The court concludes, as a matter of law, that the defendants should have judgment against the plaintiff for costs herein, except that an attorney fee of $125 be allowed to William Davison as guardian *ad litem* for the minor defendant Naida L. Simpson, to be taxed as costs against the defendant J. W. Eaglin and paid out of the estate of Mabel E. Fox Eaglin, deceased."

Judgment was entered accordingly, and plaintiff appeals, presenting a voluminous document which is designated an abstract but which is substantially a transcript of 195 pages and cluttered with many pages of formal matters which are not of the slightest consequence in an appeal. So, too, the brief makes copious citations of excellent statements of law which have no practical bearing on the case to be reviewed. Indeed, it is not easy for this court to determine just what is before it for review. The rules of appellate practice provide for a specification of the errors complained of, separately set forth and numbered, upon which appellant relies to secure a reversal of the judgment. Nothing of this sort can be found within the 261 pages of the book submitted for our perusal. However, this court has read the lengthy record and brief with painstaking care and will make such observations as are suggested by the matters discussed by appellant.

The point is first stressed that the defendant, Eaglin, is a bigamist. Much space is occupied in the brief touching the enormity of such an offense and marveling why, instead of holding the honorable office of probate judge of Pawnee county, he has not been prosecuted for his crime. But this is a civil action to set aside a will and a deed alleged to have been procured by fraud and undue influence, and it cannot be diverted into an inquiry why the state's prosecuting officers did not call Eaglin to account in a criminal proceeding for his marital irregularity. Mayhap the fact that he had openly espoused another wife and lived openly in ostensible wedlock with her for twenty years within 300 miles of the lunatic asylum which his first wife had entered as an inmate in 1905 tended to convince the state's prosecuting officers that the important fact of *intent* to commit the crime was wanting and that a prosecution would fail. The testimony of the first wife's mother, which would be fully as available and quite as persuasive in a criminal prosecution as it was in the case at bar, would tend to exculpate the defendant of intentional wrongdoing—at least the prosecuting officers might think so, and that was their business, not ours, nor that of

plaintiff and her counsel. (*State v. Trinkle,* 70 Kan. 396, 401, 402, 78 Pac. 854; *Foley v. Ham,* 102 Kan. 66, 169 Pac. 183; L. R. A. 1918C, 204, 209, 210; *State v. Finch,* 128 Kan. 665, 280 Pac. 910.)

Counsel also quote from authorities holding that contracts growing out of an adulterous relationship of a man and woman are void and unenforceable. Of course that is the law, but the penalty for marrying a woman when a man already has a wife living and undivorced is exclusively prescribed by the crimes act, and does not extend to his being utterly disqualified to take by devise or bequest of the woman he has wronged intentionally or unintentionally. The pertinent rule of law is that, subject to statutory exceptions of no present importance, any person may dispose of his property by deed or devise, by gift or bequest, without let or hindrance, in favor of anybody under the sun. (*Dreisbach v. Spring,* 93 Kan. 240, 144 Pac. 195; *Atkins v. Atkins,* 109 Kan. 453, syl. ¶ 5, 199 Pac. 922.) All the testimony in this case is that Eaglin and Mabel were unusually affectionate towards each other during all the years they lived together. The evidence which the trial court saw fit to believe tended to show that as soon as Eaglin got a response from the Osawatomie hospital that his first wife was still alive, he broke the news to her. With that strength of character which all the witnesses testified she possessed, and notwithstanding her physical infirmities, and doubtless realizing the predicament in which her death would leave the man who had tenderly cherished her for twenty years, there was nothing unnatural in her desire to dispose of her property in his favor while she still had the power to do so. Such, of course, is a different interpretation of the evidence from that which is given by plaintiff and her counsel, but it is within the range of the evidence and the evidentiary circumstances and apparently the one which the trial court adopted. And this court cannot say it abused its discretion in reasoning its way to the conclusion and judgment at which it arrived.

It is trite and familiar law that even in cases of a willful breach of the canons of morality a devise to a person with whom a testator has lived in illegal cohabitation is not invalid on that account. (28 R. C. L. 75; Id. 148; 40 Cyc. 1059; Note in 16 A. L. R. 457.)

As part of her argument that the making of the will was procured through the undue influence of defendant; appellant emphasizes the fact that she and some other relatives were not permitted to visit and communicate with the testatrix. The argument is plau-

sible; an inference more or less strong could be drawn therefrom that defendant was keeping away the members of Mabel's family so that they would not advise her touching the disposition of her property, and an inference might be drawn that defendant was secluding her in order to maintain an undue influence over her. But this is only an argument. Mabel, the testatrix, had already suffered two paralytic strokes before the will was made. She suffered another twenty-three days after the will was made. All the physicians testified that quiet and seclusion were imperatively necessary for Mabel's proper treatment. So a favorable inference that the motives which prompted defendant to keep the invalid woman in seclusion and not permit visitors, relatives or others to annoy her, can as readily be drawn as the unfavorable one so plausibly argued by appellant. Be that as it may, the facts and the inferences fairly deducible therefrom were for the trial court to consider, and its determination thereof is conclusive on appeal. In the recent case of *Stanley v. Stanley,* 131 Kan. 71, 289 Pac. 406, where brothers and sisters sought to set aside conveyances to their stepmother and younger half brother by their aged and infirm father, this court said:

"It will thus be seen that so far as this lawsuit turned upon the controverted issues of Daniel W. Stanley's capacity to execute the instruments, and whether their execution was of his own volition and not under constraint or undue influence of the grantees or either of them, the general finding and judgment of the trial court is conclusive. Indeed, the argument in plaintiff's behalf is not that there was no substantial evidence to support the general finding and judgment, but that the *preponderance* of the evidence was on the side of the plaintiffs. Doubtless plaintiffs sincerely hold to that view, but it is one which was altogether at variance with the evidence to which the trial court gave its credence, and its opinion and judgment must control. (*Sawtelle v. Cosden Oil & Gas Co.,* 128 Kan. 220, 277 Pac. 45; *Osborn v. Coverdale,* 129 Kan. 55, 59, 281 Pac. 897.) With the mere question on which side of a lawsuit the preponderance of evidence inclines the supreme court has nothing to do. (Citations.)" (p. 73.)

The requisite of independent advice was sufficiently established, since the trial court gave unqualified credence to the direct testimony on that point.

Fault is found with some of the trial court's findings, in that they did not include certain additional matters which were included in evidence adduced in plaintiff's behalf. Appellant wanted a special finding that after Mabel had suffered three paralytic strokes her mental condition was not noticeably affected and that she was

able to be about the house and take rides in an automobile. This was only an evidentiary matter, not one of the ultimate facts upon which the court's judgment necessarily had to be predicated. (*Investment Co. v. Cunningham,* 108 Kan. 703, syl. ¶ 5, 179 Pac. 212, and citations; *Hoard v. White,* 114 Kan. 531, 534, 220 Pac. 296.)

Touching so much of the judgment as pertains to the deed which plaintiff sought to have set aside, if there was no other obstacle to a judgment in plaintiff's favor her omission to tender back the $2,800 she received for the property conveyed by the deed—to tender the money into court if she was sincere in her contention that none of it was paid to her by defendant—was an insurmountable barrier to a recovery by her on that cause of action.

One general observation touching this sort of cases should be made, or rather repeated, for the court has had to take note of it many times. It is to this effect: This was quite a proper lawsuit to be tried in the district court—to be tried there with might and main; but when it was tried and determined in that tribunal so well equipped to ascertain the truth of disputed issues of fact, the case presented nothing to justify the expense of an appeal.

A brief is filed in behalf of Naida L. Simpson and Esther Simpson, designated beneficiaries under the will of their aunt, the testatrix. They appear herein as cross appellants and appellees. It is urged in their behalf that the trial court erred in not finding the will void as to J. W. Eaglin and valid as to them. We think not. The main issue was whether the will was procured through the fraud and undue influence of Eaglin. The plaintiff (and these cross appellants, if they chose to share it) had the burden of proving facts which would have vitiated the will so far as concerned the principal beneficiary. In the opinion of the trial court that burden was not maintained. Consequently the will stands as a whole. Complaint is also made because counsel for Esther Simpson was not allowed an attorney's fee. We note, however, that he was awarded a fee of $125 for his services in behalf of the minor cross appellant. The record does not show what, if any, services he performed in this lawsuit, nor does it show any request for a fee or any adverse ruling of the trial court thereon. Consequently the judgment on the cross appeal must likewise be affirmed.

The judgment is affirmed.