No. 33,259

FRANK J. JACKLIN, *Appellee*, v. THE NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY, *Appellant*.

(66 P. 2d 383)

Opinion filed April 10, 1937.

*Payne H. Ratner, Stuart T. McAlister* and *Louise Mattox,* all of Parsons, for the appellant.

*Harold McGugin,* of .Coffeyville, for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal from a judgment on a life, health and accident insurance policy.

On August 31, 1932, the defendant issued to the plaintiff a certain policy of insurance which, among other matters, contained the following provisions:

"FOR TOTAL LOSS OF TIME

"Section B. The company will pay indemnity at the rate of the *weekly indemnity* for each whole day, not exceeding two years, that the insured is wholly disabled and prevented solely by such injury from performing any and every duty pertaining to his business or occupation and is not engaged in or performing the duties of any other business or occupation and is under the regular treatment of a licensed physician.

. . . . . . . . . . . . . . . .

"SPECIAL INDEMNITY

"Section F. *This policy, subject to its provisions, conditions, and limitations, covers the insured in the event of* death or *disability resulting directly and solely from* freezing or hydrophobia, if due solely to such injury and independent of all other causes, or from *the involuntary and unconscious inhalation of gas or other poisonous vapor* (excluding suicide, sane or insane), or from blood poisoning or septicemia due directly to such injury, or from sunstroke due directly to the sun's rays." [Italics ours.]

Plaintiff was a welder by trade. He was employed by the North American Car Company. One of his duties was to enter tank cars to do any welding, fitting or riveting they might require. On July 1, 1935, while his insurance policy sued on was in force, plaintiff entered one of his employer's tank cars to do some welding. He testified:

"I got in something in this car that affected me in this way—it took the hide off my hand and off my face, and burned. I noticed while I was working in this car I would have to get out every few minutes and go wash my face in order to keep it from burning so bad. The next day or two I began noticing a burning in my chest. . . .

"I have not been working since shortly after July 1.

"My physical feelings now are that I don't seem to be able to do anything. I don't seem to be able to get my breath. If I walk any distance whatever I seem to have an awful time getting my breath. It seems like I just want to breathe and it don't do any good and I seem awfully nervous at times. I did not have that feeling prior to July 1, 1935. . . .

"Since July 1, 1935, I tried to raise a little truck and found I was not able to do it. I just gave out. I could not get my breath. It was several weeks after I was in that tank car before I began to lose my breath. I began to notice a burning in the next day or so in my chest. The burning started the next day or so after I was in the tank. It was throughout my chest. . . ."

*"Cross-examination:*

"I have been a welder about six years. . . . I would average about a car a day. There is always smoke from welding. I noticed smoke in there on all cars. . . .

"In most of the tank cars I found it necessary, after working a while, to get out and get some fresh air and then continue work, on account of the heat and the smoke. That was the only car I noticed this burning sensation. It was something in this car that kept burning my face and hands or whenever I perspired. I noticed that soon after I started to work in that car. It took me eight or ten hours to finish the car. After I was in the car a few minutes I first noticed the fumes or smoke or whatever it was bothering me, then it bothered me during the rest of the day. . . ."

*"Redirect examination:*

"I did not know it was burning me then. I did not know I was being burned inside.

"In working on any other car or welding at any other time I never encountered anything to cause my skin to peel off my forehead or hands."

Other lay witnesses gave less important testimony. Two physicians, called by plaintiff, testified to the extent and gravity of plaintiff's injuries and afflictions. Two other physicians, called by defendant, gave testimony to the general effect that there was little or nothing the matter with plaintiff. If their testimony had been given credence it might be inferred that the claimant was a malingerer and that the action was not bona fide. But the tribunal whose responsibility it was to settle all issuable matters of fact found specially and generally for plaintiff; and our concern is limited to the review of errors presented by the record.

It is urged that the demurrer to plaintiff's evidence should have been sustained, on the ground that the plaintiff's alleged injuries were not insured against by the terms of the policy. It is argued that those injuries were not accidental—that they did not result from "the involuntary and unconscious inhalation of gas" as stated in section F of the insurance policy quoted above.

This court must admit that the diligence of defendant's counsel has collated certain decisions which appear to hold that if a workman does what he deliberately intends to do, and in the course of his work receives an injury which he merely did not foresee, yet if such injury is the natural and direct effect of the work he voluntarily undertook to do, the result cannot be said to be accidental, and he is not entitled to recover on a policy covering accidental injuries. Among the cases cited in support of the doctrine just stated is *Nickman v. New York Life Ins. Co.*, 39 Fed. 2d 763, where the insured, while going about his affairs on a hot summer day, became overheated and suffered a sunstroke and died the same day. It was held that his death was not caused by an accident and that the defendant was not liable on its policy. Not a very surprising decision, and somewhat analogous to our own cases of *Hoag v. Laundry Co.*, 113 Kan. 513, 219 Pac. 516; *Taylor v. Swift & Co.*, 114 Kan. 431, 219 Pac. 516; *Chop v. Swift & Co.*, 118 Kan. 35, 233 Pac. 800; and *Williams v. Wilson*, 129 Kan. 215, 282 Pac. 574. See, however, *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793; *Gilliland v. Zinc Co.*, 112 Kan. 39, 209 Pac. 658, 29 A. L. R. 431; and *Hill v. Etchen Motor Co.*, 143 Kan. 655, 56 P. 2d 103.

Another case cited by defendant is *Martin v. Interstate B. M. A. Assn.*, 187 Ia. 869, 174 N. W. 577. In that case the insured ate some unwholesome food. It was alleged that—

"The death of decedent was accidentally caused by reason of certain food taken by the decedent into his stomach while absent from home, which food was accidentally, and without the knowledge of the decedent, of an unwholesome and dangerous character, whereby, without intent on decedent's part, or on the part of the person serving the same, said food accidentally caused decedent's stomach and bowels and the contents thereof to become fermented, and caused a violent fermentation and infection of decedent's bowels, whereby a violent retching of the stomach and bowels ensued, and a foul and dangerous condition of the bowels was so caused, whereby decedent suffered great and dangerous pain, and his system became infected and foul and dangerously inflamed; thus and thereby decedent's death shortly thereafter resulted, and was caused by reason of the facts hereinbefore stated." (p. 870.)

At the conclusion of the evidence the court directed a verdict for defendant, and on appeal the supreme court held:

"It may not be said that one died of *accidental* means when the cause of his death was acute indigestion of food voluntarily selected and eaten, with full knowledge of its wholesome or unwholesome character." (Syl. ¶ 1.)

In *Schmid v. Indiana, Etc., Accident Assn.,* 42 Ind. App. 483, 85 N. E. 1032, the insured's death resulted from heart paralysis, caused by carrying baggage up a long flight of stairs, in a rarified atmosphere. The facts did not bring the case within the terms of an accident policy covering death from "accidental means."

In *Rock v. Travelers' Insurance Co.,* 172 Cal. 462, 156 Pac. 1029, the case is sufficiently stated in the fourth paragraph of its syllabus, which reads:

"The death of the insured is not effected through accidental means where it results from an exertion put forth by him in carrying a heavy casket down a flight of stairs, during which process he neither slipped nor stumbled nor did the casket fall on him, the entire operation being carried out in precisely the manner intended and designed by him."

See, also, 5 Couch on Insurance, § 1137; and 5 Joyce on Insurance, § 2863.

The supreme court of West Virginia arrived at a different conclusion in *Miller v. Casualty Co.,* 110 W. Va. 494, 158 S. E. 706. Its headnotes tell the story and state the decision. These read:

"Where insured's automobile became stalled in a mudhole in the road in the nighttime and the following morning the engine of the car was found running, the windows closed, and the insured dead therein from the effects of carbon monoxide poisoning, occasioned by the running of the engine, such death is an injury within the terms of an accident policy insuring for injury 'sustained by the insured in automobile accidents while operating, driving, riding in or on' an automobile.

"Death by carbon monoxide poisoning caused by the running of the engine

while the automobile is stalled in a mudhole, is an injury caused by 'accidental means,' as used in an accident insurance policy." (Syl. ¶¶ 1, 2.)

The Kansas cases cited above were governed by the workmen's compensation act; and, of course, they are not controlling here. But insofar as they turned on the question of an "accident" they would be helpful; and on that point we would be inclined to follow them rather than the decisions of other states whose reasoning does not accord with our precedents. In the case at bar, however, the question of an "accident" is not the controlling point. Accident or no accident, plaintiff's policy insured him against "disability resulting directly and solely from  . . .  the involuntary and unconscious inhalation of gas or other poisonous vapor."

And since we must accept as true the evidence of plaintiff's disability and the cause thereof, since the trial court gave it that credence, it seems clear that plaintiff's cause of action fell within the literal and intended terms of the policy. Certainly there is nothing in the record to suggest that plaintiff was aware of the fact that he was inhaling any hurtful vapor as he pursued his task of welding inside that tank car. To be sure, he voluntarily went inside the car, but it is unjust to say that he voluntarily inhaled the poisonous vapor. In *Minner v. Accident Association,* 99 Kan. 575, 162 Pac. 1160, which was a gas asphixiation case, plaintiff was nonsuited because of the precise terms of the insurance contract which did not permit of an interpretation of the insurer's liability—which this court said "was evidently phrased with the purpose of avoiding the effect of the decisions of the state courts" as cited in our opinion. But the cases cited in that opinion are analogous to the case at bar. Indeed, if plaintiff's disability which resulted from the involuntary and unconscious inhalation of gas or other poisonous vapors did not render the defendant liable on plaintiff's policy, it is difficult to discern just what insurance defendant did provide under section F of its policy.

In 14 R. C. L. 931-932 it is said:

".  .  . contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense. The rule of strict construction does not authorize  . . .  the court  . . .  to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties, and embodying requirements, compliance with which is made the condition to liability thereon. Neither does the rule prevent the applica-

tion of the principle that policies of insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties."

In *Casualty Co. v. Colvin*, 77 Kan. 561, 568, 95 Pac. 565, it was said:

"The rule is practically universal that when the language of an accident policy is susceptible of different constructions that one must be adopted which is most beneficial to the insured. [Citations.]"

In its brief defendant finds fault with the extent to which the trial court catechised a witness, and it directs attention to some passage of words between court and witness. A study of the record, however, leaves nothing on that point which is open for review. (*American Automobile Ins. Co. v. Clark*, 122 Kan. 445, 448, 449, 252 Pac. 751; *Sawtelle v. Cosden Oil & Gas Co.*, 128 Kan. 220, 228, 277 Pac. 45.)

There is no error in the record, and the judgment is affirmed.